[Cite as *State v. Savage*, 2026-Ohio-2841.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
MAHONING COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

LEONARD A. SAVAGE, JR.,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
Case No. 26 MA 0001

---

Criminal Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 2015 CR 01174

**BEFORE:**
Cheryl L. Waite, Mark A. Hanni, Katelyn Dickey, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Lynn Maro*, Mahoning County Prosecutor, and *Atty. Kristie M. Weibling*, Assistant Prosecutor, for Plaintiff-Appellee

*Atty. Melanie F. Womer*, Law Firm of Stanley T. Booker, for Defendant-Appellant

Dated: July 22, 2026

---

**WAITE, P.J.**

{¶1}   Appellant Leonard A. Savage, Jr. appeals the November 25, 2025 judgment entry of the Mahoning County Court of Common Pleas dismissing his petition for postconviction relief.  Appellant concedes the trial court was correct as to certain findings in its entry, but contests the court's decision that Y-STR DNA testing ("DNA testing"), additional discovery, and calling additional witnesses at trial court would not have changed the outcome of his trial.  For the reasons that follow, Appellant's arguments are without merit and the judgment of the trial court is affirmed.

<u>Factual and Procedural History</u>

{¶2}   Because many of the facts relevant to this appeal are found within Appellant's direct appeal, the facts from that Opinion are repeated in full, here.

On November 25, 2015, Appellant was jointly indicted, with Jason N. Heard and Jawonn Hymes, for a November 14, 2015 shooting in Youngstown.  Appellant was charged with aggravated murder in the death of [T.O.] who was shot while in the backseat of a vehicle and three counts of attempted murder as to the three other occupants of the vehicle (and alternatively charged with three counts of felonious assault).  Appellant's case was severed from his co-defendants' cases and tried separately in November 2016.

At the jury trial, a victim (Erik) testified he, his cousin Lottre, his brother Tony, and his friend [T.O.] stopped at an establishment on Glenwood Avenue. Erik and Lottre placed a food order while Tony and

Thomas smoked outside. Erik saw Jason Heard (whom he knew from when Heard was a student) with Appellant (whom he did not know). (Tr. 414-415). After Erik received the food, his group returned to the car planning to drive a short distance to his aunt's house where Tony had left his vehicle parked in front of the garage. Erik was driving his girlfriend's vehicle with Lottre in the front seat, Tony in the back on the passenger side, and [T.O.] in the back on the driver's side. (Tr. 419). Erik proceeded north on Glenwood and then turned right onto Myrtle Avenue. His aunt's house was not far from that corner. Erik parked his car on the street in front of the driveway and behind a truck parked in front of his aunt's house. (Tr. 420). As they were saying goodbye to Tony, Erik noticed in his mirror a dark sedan turn the corner and pull to the side of him. (Tr. 421). He saw a gun and ducked. (Tr. 422).

Multiple shots were fired at Erik's vehicle. It sounded to him as if two different guns were being fired. (Tr. 424). He felt shots hitting his door and window, and he believed he had been shot. (Tr. 425). His brother yelled for him to pull away. (Tr. 459). He initially had difficulty putting his car in reverse; he could not go forward as he was parked behind the truck. Upon getting the car in gear, he proceeded in reverse, while Lottre asked about injuries and Tony announced that [T.O.] was dead. (Tr. 423). Erik stopped his backwards progression, put the car in drive, and drove into his aunt's front yard, partially on the driveway and partially on the grass. He pulled Thomas from Tony's arms and saw his neck wound. (Tr. 425).

Case No. 26 MA 0001

The police were called, and they arrived at 12:23 a.m., within a minute of the dispatch. The 911 calls were played to the jury. The victim was shot twice on the left side of his body: high in the neck and near the hip. The bullets recovered from his body (a .45 caliber and a .40 caliber) were fired from different guns. (Tr. 721). The police found at the scene thirteen .40 caliber shell casings (all fired by the same gun) and two .45 caliber shell casings (fired by the same gun, which was a different gun than the one which fired the .40 caliber shells). (Tr. 725, 727).

The police noticed seven bullet holes in the driver's door. It did not appear any of them penetrated through the door. (Tr. 503). The driver's window was shot out, and a bullet hit the driver's headrest. The driver's side passenger area had three bullet holes, and the window was shot out. (Tr. 504-505). The police found broken glass and blood in the street with a trail of blood showing part of the car's path into the yard. (Tr. 499). Further east on Myrtle, closer to the corner at Glenwood, the police noticed bullet fragments and broken glass and collected blood and a half-smoked cigar. (Tr. 491-492, 519). DNA consistent with Tony and Thomas was found on the cigar, and DNA extracted from the blood matched Thomas. (Tr. 519, 702-703, 878).

A witness (Female A) testified she was a long-time acquaintance of Appellant and Jason Heard. She met them at a bar on South Avenue earlier in the night of the shooting. They arrived in a silver minivan. (Tr. 558).

Later, she met them at the establishment on Glenwood Avenue. Appellant's brother, Jawonn Hymes, was with them. (Tr. 559). While they were outside, she saw Appellant, Jason Heard, and Jawonn Hymes run across Glenwood at a southerly angle. (Tr. 562). Upon seeing the police arrive, she heard her friend (Female B, the daughter of Erik's long-time girlfriend) learn about the shooting over the phone and heard Female B say it was Jason and the people with him. (Tr. 563-564). After the shooting, Jason Heard called Female A and asked to meet at another bar. (Tr. 564). When the police asked her if Jason Heard went home with her that night, she told them he did not and she would not be his alibi for the shooting. (Tr. 567-568).

The video statement of Female B was played to the jury after the court applied the forfeiture by wrongdoing exception to the confrontation clause and hearsay rules. (Tr. 603). She saw Erik, Thomas, [T.O.], and Lottre leave the establishment in her mother's vehicle. Her statement confirmed the video from the establishment and the testimony of her friend that Appellant, Jason Heard, and Jawonn Hymes ran across the street. Prior to this, she saw Jason Heard with a gun outside of the establishment. The video from the establishment confirmed that Jason Heard was holding a gun before the three defendants ran across the street.

The court also applied the forfeiture by wrongdoing exception to admit video statements of a teenage minor who was in Appellant's van. (Tr. 600, 602). He said he met Jason Heard and Appellant at a bar on South

Avenue and accompanied them in a gray van into the establishment on Glenwood Avenue. He waited in the van while Appellant and Jason Heard went in the establishment and saw Jawonn Hymes enter the establishment as well. Later, he saw the three standing outside and then running past the van to a black Nissan parked near the van. Soon after they drove away, this witness heard gunshots. Within minutes, the three co-defendants returned in the same black car. Appellant and Jason Heard entered the van, now wearing gloves.

The day after the shooting, the silver van was involved in a police chase; the driver, who appeared to be Jawonn Hymes, fled from the van on foot. The owner of the van reported it should have been in the possession of Appellant, and Appellant's cell phone was found in the van. (Tr. 745-746).

Videos from the establishment confirmed: a silver minivan pulled to the curb on Cleveland Street, which is across from the Glenwood establishment; after 15 minutes, another car parked behind the van; Appellant and Jason Heard exited the van and walked to the establishment with the occupant of the other car (Jawonn Hymes); the van lights stayed on for a long time (longer than a vehicle's automatic headlight shut-off would take) and were then extinguished (suggesting another person was still in the van and confirming the teenage witness's account); the red car holding the four victims parked in the parking lot, and the four approached the bar;

Appellant ran across the street to the van and returned wearing gloves at 12:09 a.m. (camera time); the three co-defendants and the two females stood outside of the establishment; the four victims left the establishment and proceeded to the red car at 12:12; the red car left the parking lot heading north on Glenwood Avenue at 12:14; Jason Heard was holding a gun outside of the establishment; the red car turned right on Myrtle at 12:15; Appellant, Jason Heard, and Jawonn Hymes ran across Glenwood and east on Cleveland past the van; headlights turned on in a vehicle on Cleveland at 12:16 (in the area where Jawonn Hymes came from when he arrived at the bar); the car turned north on Glenwood and right/east on Myrtle; no other cars turned east on Myrtle (besides the victim's vehicle and the pursuing vehicle) until 12:17:49, when the first police car can be seen approaching. Lastly, at 12:19, a car approached the back of the silver minivan on Cleveland, appeared to stop, and then, both the car and van drove away, turning south on Glenwood. Per police records, the first police car arrived at 12:23 a.m., and the detective testified the time on the establishment's video system was approximately 6 minutes behind actual time. (Tr. 812, 831, 924).

Tony did not testify; he died sometime in the year between the shooting and the trial. (Tr. 426). Erik knew of no reason why anyone would shoot at him, Tony, or Lottre. A detective testified that Thomas pled no contest in 2005 to negligent homicide for accidentally shooting his friend

(Richard Owens) in the head. (Tr. 676-678). Erik was present when relatives of Richard made a threat to Thomas. (Tr. 429).

An inmate testified he was incarcerated with Appellant who told him: Appellant was in a bar when he saw [T.O.], the man who killed his uncle [R.O.] in the early 2000's; with Jawonn Hymes driving, they followed him to where he was parked on Myrtle, at which point they "pulled up on them and got to shooting"; Appellant used a .40 caliber firearm which was his favorite because it penetrated vehicles; and Jason had a .45 caliber firearm. (Tr. 618-619, 623-624). The inmate also testified Appellant was nervous because a female witness cooperated with police, got jumped and threatened, stopped cooperating, and then started cooperating again; he said Appellant wanted her killed. (Tr. 619, 663-634). He said Appellant also declared he wanted a male witness dead due to his cooperation with the police. (Tr. 620, 664). After his mother visited, Appellant expressed a concern that Jason Heard would cooperate, in which case Appellant suggested he would confess and exculpate his brother Jawonn Hymes. (Tr. 621-622). Appellant also voiced a hope that the lab could not get DNA from a shell casing. (Tr. 619).

*State v. Savage*, 2018-Ohio-5125, ¶ 2-13 (7th Dist.)

{¶3} Appellant was found guilty of aggravated murder by complicity, three counts of attempted murder, and of felonious assault (which merged for sentencing purposes).

Case No. 26 MA 0001

He was sentenced to 25 years to life for aggravated murder with concurrent sentences of ten years for the attempted murders in a judgment entry filed January 17, 2017.

{¶4}   Thereafter, Appellant filed postconviction motions in the trial court. On June 22, 2018, Appellant filed a "Petition for Post-Conviction Relief to Vacate and Set Aside Judgment." The state responded by filing a motion for Judgment on the Pleadings. While the matter remained pending, Appellant obtained new counsel, who filed an amended "Post-Conviction Petition to Vacate and Set Aside Judgment." On June 28, 2022, Appellant requested a hearing on his petition. Having received no response to either of his petitions, on October 30, 2025, Appellant filed a writ seeking procedendo with this Court. On November 25, 2025, the trial court denied Appellant's postconviction petition without a hearing and on January 31, 2026, we denied the writ, as the trial court had performed the act Appellant had requested.

{¶5}   The substance of Appellant's petitions involved the following claims of ineffective assistance of counsel:  (1) failure to request and obtain certain DNA testing; (2) failure to request discovery pertaining to another murder that Appellant believes to be related to his case, (3) failure to request a curative instruction, (4) improper cross examination of witnesses, (5) failure to object to hearsay testimony, (6) failure to call relevant witnesses, (7) neglecting to subpoena a witness, (8) failure to offer rebuttal evidence to the state's motive theory, and (9) lack of an attempt to impeach law enforcement testimony regarding video evidence.

{¶6}   The court determined that all of the claims raised within the petition were barred by *res judicata* except for the issues related to DNA testing and discovery. As to those, while not barred, the court found that counsel was not ineffective. The court held

that, regardless, there was no reasonable probability the outcome of Appellant's trial would have been different but for the alleged errors.

**{¶7}** As they are interrelated, we address Appellant's assignments of error jointly.

<u>ASSIGNMENT OF ERROR NOS. 1 & 2</u>

The trial court abused its discretion in ruling that issues seven (7) and (8) were barred by res judicata.

The trial court abused its discretion in denying appellant's amended petition for post-conviction relief under R.C. 2953.21 without a hearing.

**{¶8}** Preliminarily, Appellant has conceded all of the issues he raised which the trial court found were barred by *res judicata.* Appellant now contests the trial court's decision as to DNA testing and the failure of his trial counsel to call certain witnesses to testify at trial.

*DNA Evidence*

**{¶9}** Appellant focuses on results of DNA testing completed prior to trial which generated a partial profile. That profile, however, was determined to be either too limited or degraded to be used to include a suspect as a possible contributor to that sample. Its only value was to allow investigators to exclude someone as a contributor to the sample. At trial, the DNA evidence was admitted to show that Appellant and his codefendants had all been excluded as possible contributors to that sample. In other words, the DNA found at the crime scene did not come from Appellant or his codefendants.

**{¶10}** While the DNA profile was used to exclude Appellant as a possible contributor at trial, Appellant now complains that it was not compared against the DNA of

the passengers in the victim's vehicle in an attempt to exclude them. Appellant, here, operates under the speculative theory that the backseat passenger seated next to the victim was the victim's killer. Without any evidentiary support, Appellant posits that the victim and the backseat passenger had an argument four hours before the incident that led the passenger to fire the fatal shot.

{¶11} The state responds that the passengers' DNA profiles were available prior to trial, as their DNA profiles were compared to a sample found on a half-smoked cigar. Because the evidence Appellant now seeks and the ability to compare this DNA profile to the sample that excluded Appellant was available prior to trial, *res judicata* does apply to this evidence, as well.

{¶12} To the extent that Appellant argues that his request involves new evidence because the passengers' DNA profiles were not compared to the sample until after trial, it is readily apparent Appellant could have learned this information prior to trial. Clearly, the exclusionary DNA sample and the DNA profiles for both passengers were available for comparison prior to trial.

{¶13} In support of his theory, Appellant also relies on testimony from an investigating officer opining that at least one bullet may have been fired from inside the victim's vehicle. However, Appellant concedes that this testimony was actually offered at trial, and the jury was aware that at least one shot may have been fired from inside the car. They were also aware that several bullets struck the outside of the vehicle, revealing that someone located outside of the vehicle certainly fired shots at the car.

{¶14} While the trial court did not dismiss this argument on the basis of *res judicata*, the record shows it should have been dismissed on this basis. Even so,

assuming his counsel was somehow ineffective in failing to obtain this DNA comparison prior to trial, it clearly would not have affected the outcome of the trial.

{¶15} Contrary to Appellant's speculative theory, there is no evidence that the victim and the backseat passenger had argued that day. There was testimony that the victim had an argument with someone he called "his dude" four hours before the shooting. However, there is no evidence as to who this person might have been. Even accepting Appellant's theory as true and Appellant and the backseat passenger had argued earlier that day, the argument could not have escalated to the point of a shooting, as the two men were out socializing together most of the remainder of the day.

{¶16} Significantly, Appellant himself acknowledges that the DNA comparison he seeks here was available during the trial of his co-defendant, Hymes. However, this evidence was clearly not exculpating, because Hymes elected to enter an Alford plea instead of risking trial. Hence, it appears that this evidence would have had little, if any, effect in exonerating Appellant.

{¶17} Appellant attempts, here, to use speculative evidence to suggest that someone else, a person now deceased, might have fired the fatal shot. Based on the evidence that was offered at trial, it is apparent that Appellant cannot demonstrate a reasonable probability that the evidence he now complains of would have changed the outcome of the case, and the trial court was correct to rule against Appellant on this issue.

*Discovery*

{¶18} Appellant next claims that his trial counsel's failure to seek discovery in the unrelated case regarding the backseat passenger's murder, which occurred a short time after the murder for which Appellant was convicted resulted in ineffective assistance of

Case No. 26 MA 0001

counsel. He opines, again without any evidentiary support, that the backseat passenger was murdered as "fallout" after the passenger killed the victim, here.

{¶19} Appellant again attempts to implicate the passenger (who is deceased), as the actual perpetrator of the crimes for which Appellant was convicted without any evidence of the passenger's involvement. Appellant's claims here are based on pure speculation, and there is absolutely nothing to support an ineffective assistance claim, here.

*Failure to Call Certain Witnesses*

{¶20} Appellant contends his counsel was ineffective for failing to call certain witnesses at his trial. Appellant himself concedes that each of the witnesses' credibility would be judged and weighed by the jury against the credibility of the state's witnesses. Appellant does not rely on any evidence in making his argument, here. Instead, he provides a list of individuals he believes should have been called who might have provided testimony to rebut the state's witnesses.

{¶21} In order to avoid dismissal on the basis of *res judicata,* Appellant was required to show evidence *de hors* the record which was unavailable to him at the time of trial or at the time he filed his direct appeal. As Appellant claims that his counsel was ineffective for failing to call several witnesses, those claims are best addressed in four groups.

*Jasmine Morris, Barry Wallace, Reshayla Taylor*

{¶22} The most problematic issue for Appellant as to these alleged witnesses is that he has not provided an affidavit from any of them. We have no idea what their testimony might be. Regardless, there is no question that Appellant had access to these

witnesses and knew what testimony they could offer prior to trial, and certainly by the time he filed his direct appeal. Any testimony they might have offered is not new evidence and it is just as reasonable to believe their exclusion was due to counsel's trial strategy, in any event.

*Wallace Lewis, Sr. and Samuel Richards*

**{¶23}** Lewis is an incarcerated inmate who now apparently claims that he killed the victim in this matter after a roadside argument. Lewis claims that he did not realize the shot he fired struck anyone until the next day. Richards apparently claims that the assistant prosecutor engaged in misconduct by providing him with information in Appellant's case and sought to have him testify against Appellant.

**{¶24}** While each of these witnesses provided a document purporting to be an affidavit, there are defects with each of them. Lewis's document contains the following handwritten section at the bottom: "SWORN TO AND SUBSCRIBED BEFORE ME A NOTARY PUBLIC FOR THE STATE OF OHIO ON THIS _____ DAY OF _____ 20__. NOTARY _____." Those blanks are all empty. In addition, nowhere does the document include a date. As to Richards' "affidavit," it lacks his signature, a date, and is not notarized.

**{¶25}** R.C. 2319.02 defines an affidavit as "a written declaration under oath." "An affidavit must appear, on its face, to have been taken before the proper officer and in compliance with all legal requisites. A paper purporting to be an affidavit, but not to have been sworn to before an officer, is not an affidavit." *In re State ex rel. White v. Franklin Cty. Bd. of Elections*, 2020-Ohio-524, citing *Disqualification of Pokorny*, 74 Ohio St.3d

1238 (1992).  Under established Ohio law, unsworn statements are not evidence.  *State v. Orr*, 2025-Ohio-5514, ¶ 28 (8th Dist.).

**{¶26}** Neither document Appellant has submitted constitutes an affidavit that would qualify as evidence.  Appellant was represented by counsel in his postconviction filings and should certainly have been aware of the legal requirements.  These filings do not, in any fashion, support Appellant's claims of ineffective assistance.

*Abdiezel Hassen*

**{¶27}**  Similar to Richards, Hassen claims that an assistant prosecutor approached him with information about the shooting in an attempt to gain testimony against Appellant at trial.

**{¶28}** Like the other "affidavits," Hassen provided no evidence as to when Appellant became aware of his claims.  Thus, there is no showing this was "newly discovered."  Even so, Hassen's claims would not have changed the outcome of Appellant's trial, given the overabundance of evidence against him based on the record, here.  This "evidence" also fails to support Appellant's claim of ineffective assistance.

*Treschell Dallas, Officer Brent Gaitanis, and Jerry Shaughnessy*

**{¶29}** Dallas also did not file an appropriate affidavit in this matter.  Instead, Appellant has attached a signed witness statement from Dallas indicating that she had made plans with Appellant's codefendant Hymes allowing him to use her car the night of the murder.  She asked Hymes to place the keys under the mat when he returned her car.  In her statement she never identifies the car she claims to have loaned to Hymes in any fashion, to establish the vehicle as somehow important to Appellant's conviction.  Nonetheless, the witness statement is dated November 2, 2016, prior to Appellant's trial.

Case No. 26 MA 0001

Obviously, any information she possessed is not new evidence and could have been raised at trial and certainly also on direct appeal, and does not support Appellant's postconviction arguments. Neither Officer Gaitanis nor Shaughnessy provided any affidavit at all. Hence, his arguments here also have no merit.

*Failure to Rebut Motive Evidence*

{¶30} Appellant's argument, here, is not entirely clear. However, it appears related to his motive, which investigators believed to be revenge, as the victim had killed Appellant's uncle ("R.O."). Appellant now claims he learned after the trial in an obituary for R.O. that R.O. actually was not Appellant's uncle. We interpret this information to be offered as an attack on the state's motive offered at trial.

{¶31} To the extent that Appellant suggests that he only learned R.O. was not his uncle after trial, his claim is irrelevant. It would not matter what Appellant learned after the fact. If, at the time of his shooting, he believed R.O. was his uncle, it could be considered as his motive for killing the victim, here. If he is actually now claiming he knew prior to the killing that R.O. was not his uncle and that his counsel should have offered such evidence, his argument is barred by *res judicata*. Either way, his argument here fails to support his postconviction ineffective assistance claims.

*Outcome of the Case*

{¶32} In order to successfully assert his claims, Appellant needed to show that the evidence offered was not only *de hors* the record but would have changed the outcome of the case. As noted by the trial court, all of Appellant's so-called "evidence" is merely speculative and insufficient to contradict the plethora of evidence raised at trial as to Appellant's guilt, including "direct evidence of the crucial evidence minutes before and

after the murder" along with Appellant's confession to a fellow inmate consistent with this evidence.

**{¶33}** The evidence at trial included witness testimony that Appellant was seen putting black gloves on and holding a gun shortly before the murder. Video footage shows Appellant and his codefendants leaving the bar and running to a vehicle that they drove in the direction where the shooting occurred. Approximately three minutes after the shooting, the vehicle returned. Appellant and one of his codefendants can be seen still wearing the black gloves. Each witness that Appellant now seeks to have testify would merely offer somewhat contradictory testimony, at best. This is insufficient to overcome the high burden associated with successfully asserting an ineffective assistance of counsel claim. Again, in Ohio counsel is presumed effective and given wide latitude in determining trial strategy. As virtually all of the "evidence" Appellant now raises was clearly known to Appellant before his trial, it may well have been trial strategy not to offer this evidence, which does not exculpate Appellant and does not support in any way his speculative contention that it may have changed the outcome, here. Appellant's assignments of error are without merit and overruled.

## Conclusion

**{¶34}** Appellant argues that he received ineffective assistance of counsel due to his counsel's failure to seek further DNA testing, additional discovery, and call additional witnesses. For the reasons provided, Appellant's arguments are without merit and the judgment of the trial court is affirmed.

Hanni, J. concurs.

Dickey, J. concurs.

Case No. 26 MA 0001

---

For the reasons stated in the Opinion rendered herein, Appellant's assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed. Costs waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## <u>NOTICE TO COUNSEL</u>

**This document constitutes a final judgment entry.**